UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
CYNTHIA J. GILMAN,                               :

                 Plaintiff,          :

      -against-                               :

ROBERT MCCARTHY, ALVAREZ &       :
MARSAL, TRANSACTION ADVISORY
GROUP, LLC, MAROLLES, LLC, d/b/a     :
BXL CAFÉ EAST, YVES MICHIELS, SHP
ENTERPRISES, INC. d/b/a ENVY, PETER  :
PARK, SUK HUI PARK, 218 EAST 52ND
STREET RESTAURANT, LLC d/b/a         :
NIALL'S ON 52ND, MATTHEW MORAN,
NIALL P. MORAN, XYZ CORPORATION:  :
(names unknown) fictitious corporations,
limited liability companies or partnerships,       :
JOHN DOE and MARY ROE, (name
unknown), fictitious persons,                      :

       Defendants-Crossclaimants.   :
-------------------------------------------------------X
KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

**USDC SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
**DOC #:** _____
**DATE FILED:** __5/7/15__

**MEMORANDUM AND ORDER**

13-CV-1716 (KNF)

## BACKGROUND

    Cynthia J. Gilman ("Gilman") commenced this action for damages resulting from

injuries she sustained, on March 23, 2011, at approximately 4:15 a.m., while driving northbound

on Route 9, in New Jersey, when Robert McCarthy ("McCarthy"), who was driving southbound

on Route 9, crossed over into her lane of travel, striking her vehicle head-on.  Gilman alleges

that, commencing in the evening of March 22, 2011, and continuing through the early morning

of March 23, 2011, McCarthy, employed as a managing director of Alvarez & Marsal

Transaction Advisory Group, LLC, was acting within the scope of his employment when he and

other employees entertained a prospective employee at the following New York establishments:

Marolles, LLC d/b/a BXL Café East ("BXL"), SHP Enterprises, Inc. d/b/a Envy ("Envy") and

218 East 52nd Street Restaurant, LLC d/b/a Niall's on 52nd ("Niall's"). Gilman asserts that, in the

course of entertaining the prospective employee on behalf of Alvarez & Marsal Transaction

Advisory Group, LLC, McCarthy consumed alcohol and became intoxicated, achieving a blood

alcohol concentration of approximately .24, three times the legal limit in New Jersey. Gilman

alleges that, as a result of the March 23, 2011 automobile collision, she suffered permanent

injuries. Gilman asserted that she underwent a number of surgical procedures and will have to

undergo future medical treatment. According to Gilman, as a result of her injuries, she will be

unable to attend to her usual employment. Gilman asserted the following claims in this action:

(1) negligence against McCarthy and Alvarez & Marsal Transaction Advisory Group, LLC;

(2) gross negligence against McCarthy and Alvarez & Marsal Transaction Advisory Group,

LLC; (3) violations of New York's Dram Shop Act, General Obligations Law Section 11-100[1]

and 11:101, and Alcohol and Beverage Control Law Section 65,[2] against BXL, Envy, Niall's,

Yves Michiels, Peter Park, Suk Hui Park, Matthew Moran, Niall P. Moran and Alvarez & Marsal

Transaction Advisory Group, LLC, jointly and severally; and (4) negligent supervision and

hiring against Yves Michiels, Peter Park, Suk Hui Park, Matthew Moran and Niall P. Moran.

Gilman also seeks punitive damages under New York's Dram Shop Act, as well as interest, costs

and disbursements in this action. The defendants made crossclaims for contribution and

---

[1] Gilman asserted, improperly, a claim based on New York General Obligations Law § 11-100, which concerns compensation for an injury caused by the intoxication of a person under the age of twenty-one. Gilman did not assert that McCarthy was under twenty-one years of age on March 23, 2011.

[2] To the extent that Gilman asserted a claim based on New York's Alcoholic Beverage Control Act § 65, she cannot, as Section 65 "does not create a private right of action." Sherman v. Robinson, 80 N.Y.2d 483, 487, 591 N.Y.S.2d 974, 976 (1992).

indemnity.  Before the Court are: (1) Alvarez & Marsal Transaction Advisory Group, LLC's motion for summary judgment, seeking dismissal of the plaintiff's claims against it; and (2) Gilman's motion for partial summary judgment on her claims of negligence against (i) McCarthy and (ii) Alvarez & Marsal Transaction Advisory Group, LLC, based on vicarious liability. McCarthy did not oppose Gilman's motion.

### *Alvarez & Marsal Transaction Advisory Group, LLC's Motion for Summary Judgment*

Alvarez & Marsal Transaction Advisory Group, LLC ("the employer") contends that it is not liable, under the doctrine of respondeat superior, for negligence and gross negligence because Gilman cannot establish that the tortious conduct was foreseeable and a natural incident of McCarthy's employment.  The employer asserts that it "could not possibly have condoned, instigated or authorized McCarthy's conduct" given that, inter alia, it was not involved in recruiting the prospective employee, Francois Chadwick ("Chadwick"), and had a written policy prohibiting the conduct in which McCarthy engaged.  The employer maintains that it "allowed its employees to take car services home all the time with no questions asked," and it "did not require its employees to drive their personal automobiles to work."  The employer asserts that McCarthy's acts did not occur within the scope of his employment because: (1) he "engaged in criminal conduct by driving while intoxicated, which alone takes his conduct outside of the scope of his employment"; (2) he drove home in his personal car; and (3) his duties and responsibilities did not require him "to be out that evening."  According to the employer, even if McCarthy's entertaining Chadwick was connected to his employment, "those efforts came to an end when the Taxand [Alvarez & Marsal Taxand, LLC] employees left BXL at 8:00 p.m. or, at the latest, when Chadwick went home for the evening at 11:40 p.m."  The employer asserts it is not liable under the Dram Shop Act because its actions do not fall within the statute, and no

evidence exists that the employer assisted unlawfully in procuring alcohol for McCarthy. Moreover, even if the Dram Shop Act applied, Gilman's claim fails "because McCarthy was not visibly intoxicated at BXL."

### Plaintiff's Motion for Partial Summary Judgment

Gilman contends that New Jersey law respecting respondeat superior should apply in this case because "[t]here is a substantive conflict between New Jersey's law of *respondeat superior* and New York's — New Jersey recognizes exceptions to the 'coming and going' rule that New York does not." According to Gilman, "[u]nder New York Court's interpretation of the 'coming and going' rule, parties injured by intoxicated employees do not have recourse against the employer," while "New Jersey has a much more nuanced approach to the 'coming and going' rule than New York does." Gilman asserts that, "where an 'interest analysis' regarding a choice of law question does not point clearly to the law of any jurisdiction, the law of the place where the tort occurred will control." She maintains that New Jersey law should apply because McCarthy and Gilman were domiciled in New Jersey at the time of the March 23, 2011 automobile collision, and McCarthy's vehicle was registered in New Jersey. Gilman asserts that "New Jersey has a strong public and legal interest in preserving the safety of its roads, protecting its residents from drunk drivers, and recovering for expenditures made from the public coffers as a result of drivers' negligence on its roadways."

Gilman contends that, under New Jersey law, as articulated in Carter v. Reynolds, 175 N.J. 402 (2003), "there are well-established exceptions [to the 'coming and going' rule] when an employer requires an employee to use his or her own vehicle for work." She asserts that the employer is liable because "McCarthy was requested by an affiliate company to entertain" Chadwick, and he "was on a 'special mission' to entertain and hopefully recruit, for

4

A&M Tax, Francois Chadwick."  According to Gilman, "[n]ot only does New Jersey's special errand exception apply," but under the California case law, on which the <u>Carter</u> court relied, that "it is sufficient that alcohol consumption occurred within the scope of employment," was also "embraced by the Supreme Courts of Hawaii, Oregon and Washington," and should apply here.

***Alvarez & Marsal Transaction Advisory Group, LLC's Opposition to the Plaintiff's Motion***

In opposition to the plaintiff's motion, the employer contends that New York and New Jersey apply the same respondeat superior standard, as they both "recognize that an employer can only be held responsible for the negligent acts of its employee 'if, at the time of the occurrence, the employee was acting within the scope of his or her employment.'"  Moreover, New York and New Jersey both hold that "an employee who is driving his or her personal vehicle to and from the employer's workplace is not within the scope of employment for the purpose of imposing vicarious liability on the employer."  Since no conflict exists between New York and New Jersey laws, New York law should apply.  The employer contends that even if an actual conflict exists between New Jersey and New York laws, the interest analysis favors New York law, given that "the single relevant act that occurred in New Jersey is the automobile accident," in contrast to "the overwhelming connections to New York," including: (a) four out of five defendants are domiciled in New York; (b) McCarthy was employed in New York; (c) the terms of McCarthy's employment were governed by New York law; (d) the relevant employment policies and procedures are governed by New York law; (e) McCarthy consumed alcohol in New York; (f) McCarthy parked in and retrieved his vehicle from a New York garage; (g) McCarthy was in New York, on March 22 and 23, 2011; and (h) the plaintiff alleged that the recruitment activities occurred in New York.  The employer contends that New Jersey law applies to the negligence claims against McCarthy because the automobile collision occurred in

New Jersey, and McCarthy and Gilman resided there, but New York's interest in whether a New York employer can be liable is a different issue given that employers rely on New York laws when determining their employment policies and procedures. According to the employer, the plaintiff relies on the employer's policies and procedures to demonstrate that McCarthy's actions were within the scope of his employment.

The employer contends that, even under New Jersey's narrow exceptions, the claims against it must be dismissed because the undisputed facts show that the employer "in no way required employees to drive to work, let alone use their personal vehicles to visit clients." The employer asserts that McCarthy was not coming home from visiting a client, on March 23, 2011, and he had the option of taking a car service or mass transit to his home. Additionally, McCarthy visited Niall's by himself, after his companions left, for his personal reasons, and he was not reimbursed for using his car that evening. Moreover, the employer contends, no evidence exists that McCarthy was on any special mission on behalf of the employer in attempting to drive home from New York City, and the plaintiff failed to make citation to any New Jersey law in support of that argument. As no evidence exists of a dual purpose respecting McCarthy's attempt to drive home from New York City, after consuming alcohol for his personal enjoyment, no exception applies in this case. The employer asserts that California and Washington cases are irrelevant because those states have no connection to this litigation.

***Plaintiff's Opposition to Alvarez & Marsal Transaction Advisory Group, LLC's Motion***

In her opposition to the employer's motion, Gilman contends that she "is not pursuing the Third Count - Dram Shop cause of action as it applies to defendant, Alvarez & Marsal Transaction Advisory Group." She asserts that New Jersey's respondeat superior law applies to this case because "New Jersey follows the approach of *Restatement 2d Agency* 228 and 229

(1958) under which foreseeability is only directly imputed in cases involving an employee's use of force," and in New Jersey, the "scope of employment is subject to analysis under *Restatement* 228 and 229." According to Gilman, "either McCarthy was directly requested to assist in the recruitment of Chadwick, or, in the alternative, he and/or [H. Mark] Sponseller ["Sponseller"] made a business decision, on their own, that it would be in the best interest of the A&M companies as a whole (which includes A&M TAG and A&M Tax), to have Chadwick, a much sought-after tax specialist . . . accept the position with A&M Tax." Furthermore, "McCarthy was both instructed and empowered to entertain as part of his job," and the employer's objectives "were being carried out through McCarthy's attempts to convince a high-level recruit to join the firm." Gilman asserts that McCarthy's driving while drunk and causing the collision were grossly negligent acts. She contends that, under New York law, the employer had actual notice of McCarthy's excessive alcohol consumption because: (a) McCarthy's supervisor, Paul Aversano ("Aversano"), had "the ability to observe McCarthy drinking to excess"; (b) Sponseller had been present, in the past, when McCarthy "drank himself into a blackout state"; and (c) on prior occasions, McCarthy lost his company issued laptop computer and Blackberry telephone because of drinking.

Gilman contends that the employer ratified McCarthy's actions. She asserts that Aversano became aware that McCarthy was involved in an automobile collision and that someone was injured, seriously, but failed to conduct a thorough investigation into the circumstances. Gilman asserts that "[t]he ratification is set forth in the reasons why McCarthy was not fired," namely, "McCarthy was not fired for being at a geisha bar," or "for his consumption of alcohol, for drunk driving, or for being in an accident while drunk." Moreover, despite the facts that "it was Sponseller's credit card that was used to entertain Chadwick, and

that Sponseller also charged his car service home that evening, no disciplinary actions were taken against him nor taken against Matthew Savarese" ("Savarese"). Gilman asserts that the employer ratified McCarthy's conduct because, after the automobile collision, it failed to change its entertainment and recruitment policies and procedures. Gilman maintains that, under New York law, "failure to repudiate a course of action, where the principal had the opportunity to do so, constitutes a ratification." Gilman asserts that nothing in the record indicates that McCarthy was not acting in the course of his employment, and "he was clearly entertaining a high-level recruit and trying to convince him to join the firm."

***Alvarez & Marsal Transaction Advisory Group, LLC's Reply***

The employer asserts that the plaintiff in her opposition makes arguments based on a New York agency law theory, conceding that New York law should apply. It contends that the plaintiff offered no evidence that McCarthy's driving home in an intoxicated state furthered the employer's business objectives, or that "McCarthy getting into his car that evening and driving while intoxicated was foreseeable." According to the employer, the plaintiff abandoned her argument that New Jersey law should apply when she presented her "new theory based upon a distortion of New York's common law application of the agency principle," which is unsupported by the facts and the law. The employer asserts that, to support the plaintiff's theory of ratification, she would have to show a transaction or contract between the plaintiff and McCarthy, and no evidence exists that such a transaction existed "that was somehow ratified by" the employer. Additionally, the plaintiff's argument that the employer ratified McCarthy's acts when it did not terminate his employment for driving while intoxicated or change its policies is meritless because McCarthy's negligence did not benefit the employer, was not related to his duties and responsibilities and did not create a form of transaction or contract with the plaintiff.

8

*Plaintiff's Reply*

In reply, Gilman asserts that "McCarthy was the ultimate 'distracted driver' and, under the New Jersey Supreme Court's analysis," the employer is vicariously liable to her. Gilman contends that "the California enterprise liability theory," which the Carter court discussed, should apply here. According to Gilman, the "term 'distracted driver' equates with the term 'instrumentality of danger,' which was adopted by California," and McCarthy was "the ultimate distracted driver" because he "was driving in a blackout state, causing the accident." Gilman asserts that the Court, "in considering the application of the broad California rationale of enterprise liability, should analyze plaintiff's contentions as the current New Jersey Supreme Court would do." Gilman contends that "New Jersey has the most significant contacts under the Neumeier v. Kuehner, 31 N.Y.2d 121[,] 335 N.Y.S.2d 64 (1972), test."

## UNDISPUTED FACTS

Alvarez & Marsal Transaction Advisory Group, LLC is a limited liability company with its principal place of business in New York, New York. Alvarez & Marsal Taxand, LLC is a limited liability company with its principal place of business in New York. Alvarez & Marsal Taxand, LLC is a majority owned subsidiary of Alvarez & Marsal Holdings, LLC, a limited liability company with headquarters in New York.

In March 2011, Melody Summers ("Summers") was the managing director responsible for recruitment for Alvarez & Marsal Taxand, LLC, and was involved in recruiting Chadwick, who lived in San Francisco, for a managing director position with Alvarez & Marsal Taxand, LLC. By the middle of March, 2011, Alvarez & Marsal Taxand, LLC was prepared to present Chadwick with a formal offer to become Alvarez & Marsal Taxand, LLC's managing director in San Francisco. Before Alvarez & Marsal Taxand, LLC extends a formal offer to employ a

managing director, it is customary to have the candidate fly to New York to meet with Antonio

C. Alvarez ("Alvarez"), a member of the Board of Managers of Alvarez & Marsal Taxand, LLC

and the Co-Chief Executive Officer of Alvarez & Marsal Holdings, LLC. Chadwick flew to

New York on March 21, 2011. On March 22, 2011, Chadwick met with Alvarez and Robert N.

Lowe ("Lowe"), the Chief Executive Officer of Alvarez & Marsal Taxand, LLC. Immediately

after Chadwick's meeting with Lowe and Alvarez, Lowe informed Chadwick, verbally, that he

would be receiving a formal offer from Alvarez & Marsal Taxand, LLC for a managing director

position.

McCarthy and Chadwick worked together in the United Kingdom, from 1996 to 1999,

and were housemates for some of that time. McCarthy and Chadwick were not in contact from

1999, until February 2011.

On March 22 and 23, 2011, McCarthy, Sponseller and Savarese were employed by

Alvarez & Marsal Transaction Advisory Group, LLC. On March 22, 2011, McCarthy was a

patron of BXL and Envy, where he consumed alcohol. Chadwick, Summers, Albert Liguori,

Sponseller and Savarese were also patrons of BXL, on March 22, 2011. Sponseller paid the

BXL bill, at approximately 9:13 p.m. Sponseller approved his own expenses and his

reimbursement of the BXL bill by Alvarez & Marsal Transaction Advisory Group, LLC. After

visiting BXL, McCarthy, Chadwick, Sponseller and Savarese visited Envy, a geisha bar. The

bill at Envy was $1,770, and was paid in equal parts by McCarthy, Sponseller and Savarese. No

portion of the bill at Envy was submitted for reimbursement. McCarthy retrieved his vehicle

from a parking garage in New York, on March 23, 2011, at approximately 1:33 a.m.

On March 23, 2011, at approximately 4:15 a.m., while driving his vehicle in an

intoxicated state southbound on Route 9 in New Jersey, McCarthy crossed into a northbound

lane and struck a vehicle driven by Gilman.  As a result, Gilman sustained serious injuries.

McCarthy's blood alcohol concentration, as measured on March 23, 2011, at 5:40 a.m., was

.242.

## SUMMARY JUDGMENT STANDARD

A motion for summary judgment should be granted "if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the

governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510

(1986).  A "dispute about a material fact is 'genuine,' . . . if the evidence is such that a reasonable

jury could return a verdict for the nonmoving party." Id.  In determining whether a genuine issue

as to any material fact exists, a "district court is required to resolve all ambiguities and draw all

factual inferences in favor of the party against whom summary judgment is sought." St. Pierre v.

Dyer, 208 F.3d 394, 404 (2d Cir. 2000).  Additionally, "the court is not entitled to weigh the

evidence" and "if there is any evidence in the record from any source from which a reasonable

inference could be drawn in favor of the nonmoving party, summary judgment is improper." Id.

### Choice of Law

In diversity actions, federal courts must apply the choice-of-law principles of the forum

state.  See Klaxon Co. v. Stentor Electric Mfg. Co., Inc., 313 U.S. 487, 496, 61 S. Ct. 1020, 1021

(1941).  Here, New York choice-of-law principles apply because New York is the forum state.

"The first step in any case presenting a potential choice of law issue is to determine

whether there is an actual conflict between the laws of the jurisdictions involved." Allstate Ins.

Co. v. Stolarz, 81 N.Y.2d 219, 223, 597 N.Y.S.2d 904, 905 (1993).  "If no actual conflict exists,

and if New York is among the relevant jurisdictions, the court may simply apply New York

11

law." <u>Licci v. Lebanese Canadian Bank, Sal</u>, 672 F.3d 155, 157 (2d Cir. 2012).  If an actual

conflict exists,

> New York utilizes interest analysis to determine which of two competing jurisdictions has the greater interest in having its law applied in the litigation.  The greater interest is determined by an evaluation of the "'facts or contacts which
> * * * relate to the purpose of the particular law in conflict.'"  Two separate inquires are thereby required to determine the greater interest: (1) what are the significant contacts and in which jurisdiction are they located; and (2) whether the purpose of the law is to regulate conduct or allocate loss . . . As to the second inquiry, a distinction must be made between a choice-of-law analysis involving standards of conduct and one involving the allocation of losses.  In the former case the law of the place of the tort governs. . . . "[W]hen the conflicting rules involve the appropriate standards of conduct, rules of the road, for example, the law of the place of the tort 'will usually have a predominant, if not exclusive, concern' * * * because the locus jurisdiction's interests in protecting the reasonable expectations of the parties who relied on it to govern their primary conduct and in the admonitory effect that applying its law will have on similar conduct in the future assume critical importance and outweigh any interests of the common-domicile jurisdiction."  Conduct-regulating rules have the prophylactic effect of governing conduct to prevent injuries from occurring.  "If conflicting conduct-regulating laws are at issue, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders."  Loss allocating rules, on the other hand, are those which prohibit, assign, or limit liability after the tort occurs, such as charitable immunity statutes, guest statutes, wrongful death statutes, vicarious liability statutes, and contribution rules.
>
> <u>Padula v. Lilarn Properties Corp.</u>, 84 N.Y.2d 519, 521-22, 620 N.Y.S.2d 310, 311-12 (1994) (internal citations omitted).

In loss allocation analysis, under <u>Neumeier</u>: (1) when the disputing parties "share a common

domicile, that law should control"; (2) "when the driver's (defendant's) conduct occurred in the

State of domicile and that State would not impose liability, the driver should not be exposed to

liability under the law of the victim's domicile," and, "[c]onversely, when the plaintiff-passenger

is injured in the place of domicile and would be entitled to recover, the out-of-State driver should

generally be unable to interpose the law of his or her domicile to defeat recovery"; and (3) in

other "split-domicilee cases, . . . the usually governing law will be that of the place where the

accident occurred, unless 'displacing that normally applicable rule will advance the relevant substantive law purposes without impairing the smooth working of the multistate system or producing great uncertainty for litigants," generally, the place of injury is used "as the determining factor." Cooney v. Osgood Machinery, Inc., 81 N.Y.2d 66, 73-74, 595 N.Y.S.2d 919, 923 (1993) (citing Neumeier, 31 N.Y.2d at 128, 335 N.Y.S.2d at 457-58).

> ### Whether An Actual Conflict Exists Between New York and New Jersey Negligence Laws Based On the Doctrine of Respondeat Superior

Under New York law, "[t]he doctrine of respondeat superior renders an employer vicariously liable for torts committed by an employee acting within the scope of the employment." Judith v. Sisters of Charity Hosp., 93 N.Y.2d 932, 933, 693 N.Y.S.2d 67, 68 (1999). "As a general rule, an employee driving to and from work is not acting in the scope of his employment. . . . An exception to this rule is, that an employee who uses his car in furtherance of his work is acting in the scope of his employment while driving home from his last business appointment, since such a person is working, and is under his employer's control, from the time he leaves the house in the morning until he returns at night." Lundberg v. State of New York, 25 N.Y.2d 467, 471, 306 N.Y.S.2d 947, 950 (1969). However, if an employee is "engaged in an independent personal activity over which [the employer] had no control," then "the general rule applies." Id., 306 N.Y.S.2d at 951.

Under New Jersey law, "[u]nder respondeat superior, an employer can be found liable for the negligence of an employee causing injuries to third parties, if, at the time of the occurrence, the employee was acting within the scope of his or her employment." Carter v. Reynolds, 175 N.J. 402, 408-09 (2003). "Generally, an employee who is 'going to' or 'coming from' his or her place of employment is not considered to be acting within the scope of

employment." Id. at 412.  Exceptions to this general rule apply to a situation involving commuting when: (1) "the employee is engaged in a special errand or mission on the employer's behalf"; (2) "the employer requires the employee to drive his or her personal vehicle to work so that the vehicle may be used for work-related tasks"; and (3) "the employee is 'on-call.'" Id. at 414.

> The special mission exception has fairly well-defined margins.  When an employee, having identifiable time and space limits on his employment, makes an off-premises journey which would normally not be covered under the usual going and coming rule, the journey may be brought within the course of employment by the fact that the trouble and time of making the journey, or the special inconvenience, hazard, or urgency of making it in the particular circumstances, is itself sufficiently substantial to be viewed as an integral part of the service itself.  The "special" aspect of the exception requires, at the very least, that the employee perform an act outside the ordinary confines of his or her job description at the behest of the employer.

> Id. at 417-18 (citation omitted).

Gilman does not contend that an actual conflict exists between the general New York law and the general New Jersey law concerning an employer's liability for negligence, based on the respondeat superior doctrine.  Rather, she maintains that "New Jersey recognizes exceptions to the 'coming and going' rule that New York does not," namely "the special mission" exception, which she asserts applies here.  However, Gilman is mistaken.  Both New York and New Jersey recognize exceptions to the general "coming and going rule."  See Lundberg, 25 N.Y.2d at 471, 306 N.Y.S.2d at 950; Carter, 175 N.J. at 408-09.  More specifically and contrary to Gilman's contention, New York law recognizes New Jersey law's "special errand" exception to the general rule: that an employee is not within the scope of his or her employment in driving to or from work, where the employee is engaged in a special errand or mission on behalf of the employer, which was discussed in Carter and on which she relies.  See Clark v. Hoff Bros.

Refuse Corp, 72 A.D.2d 936, 937, 422 N.Y.S.2d 219, 220 (App. Div. 4th Dep't 1979) (finding that when transporting a lawn spreader, the employee was acting in his employer's interest and "his arrival at the place of the accident at the time it occurred was occasioned solely by the errand for" the employer); Bazan v. Bohne, 144 A.D.2d 168, 169-70, 534 N.Y.S.2d 496, 497-98 (App. Div. 3rd Dep't 1988) (the employee ran "errands" for the employer once or twice a week and the "accident did not occur while [the employee] was returning home from his normal work site but while returning from getting a part from another area where he had traveled to at the direction of his employer."). The Court finds that no actual conflict exists between New York law and New Jersey law concerning an exception to the general rule: that an employee is not within the scope of his or her employment in driving to or from work, where the employee is engaged in a special errand or mission on behalf of the employer. Accordingly, since no conflict exists between New York law and New Jersey law, and New York is among the relevant jurisdictions, the Court will apply New York law. See Licci, 672 F.3d at 157.

### Plaintiff's Negligence Claims Against Alvarez & Marsal Transaction Advisory Group, LLC Based On the Doctrine of Respondeat Superior Under New York Law

Whether, at the time of the automobile collision, McCarthy was acting within the scope of his employment is disputed. The employer's Rule 56.1 statement No. 67, that "On March 22, 2011, McCarthy made plans with Chadwick to go to dinner after he completed his interviews with Taxand," is not supported by the evidence. McCarthy testified at his deposition:

Q. And then was he – was he going to be then taken out by you and by Mark?
A. We had arranged to see him after his full day of interviews, to go to BXL.
Q. Okay. And did people accompany you from A&M?
A. There was a - - well, there was Mark Sponseller and Matt Savarese and then there were a couple tax MDs came along who had been involved in the recruitment during the day, yes.
Q. All right. So they were all aware that you were all going to meet and take him to dinner, is that correct?

15

A. Yes, yes.  There had been knowledge that we were going to meet him after his interviews.

Q. And was this a typical part of the recruiting process, then, to take the recruit out to dinner?

A. It has been done.

Q.  Okay.  And do you know if Mark wrote this up in his expense account as a dinner, a recruitment dinner.

A. I don't know.

Q.  As far as you were concerned, was this trying to get him to come with your company?

A. That was a vested interest to get him to join A&M, yes.

Q. Okay.  And was that part of the discussions?

A. Oh, absolutely.  You know, we were trying to tell him it was a good place to be.

Q. Okay.  And that was the purpose of entertaining him?

A.  Well, myself personally, it was joint, because he was an old friend I had not seen in a long time.

Q. So you had personal and also business?

A. Correct.

Q. Okay.  Now, did you have to get approval or pre-approval to take him to dinner?

A. No.

* * *

Q. Okay.  And were the accountants managing directors also?

A. The tax individuals?

Q. Yes.

A. Yes.

Q. So these were all high executives at A&M; is that correct?

A. Correct.

Q. Do you know their names?

A.  I don't recall their names.  There was a tax MD that maybe was called Somers.

Q. All right.

A. But I don't know.

Q. All right.

A. There would have been an e-mail exchange with them earlier in the day, though.

Q. Okay.  Who was authorized to make him an offer on behalf of the company?

A. That would have been with the tax department.

Q. Okay.  And the tax department, did they want you on board to try to get him to agree to come with their company?

A. That wasn't specifically expressed, I don't believe, but we were trying to show him the wider firm.  A&M, at the time, they were at a disadvantage to one of the bigger firms and people didn't know their full spectrum of services, so it was our duty to show them the wider firm.

Q. So this was part of the recruiting process?

A. It's not in any manual that it would be, but yes.

16

Chadwick testified at his deposition:

Q.  Okay.  Tell me what happened.

A.   Subsequent to me having the interview with Tony Alvarez, that's when I met Rob.

Q.  Okay.  And was that prearranged, did you seek him out, how did that occur?

A.   They facilitated meeting him.  He was - - he was back from somewhere, I can't recall where, and they said Rob's here, let's - - you can connect.

Q.  Okay.  Who was "they"?

A.  I think Bob Lowe.  I think.

Q.  Head of tax unit?

A.  Mm-hmmm.  Yeah.

Q.  Yes.  Were they then going to take you out for some drinks after work?

A.  Yes.

Q.  Okay.  Did Mr. Lowe mention that to you?

A.  May not have been Mr. Lowe.  If it wasn't, it was Melody.

Q.  Melody Summers?

A.  Yes.

Q.  Okay.  And tell me now how - - Rob's back.  Tell me now about the meeting with Rob, what time if you can approximate, and where it was?

* * *

A.  Well, it - - it would have been later in the day.  And I can't - - I can't put an exact time, but it could be 5:00, 6:00 p.m.

Q.  Okay.

A.  And we left Alvarez and went to a bar with a number of A&M people.

* * *

Q.  What did you talk about at Envy?

A.  With whom?

Q.  With anybody  What was the nature of the discussions?

A.  Continuing the discussion about joining A&M.

Summers testified at her deposition:

Q.   Was it decided during the course of that day to meet up after work with Mr. Chadwick?

A.  Yes, I believe so.

Q.  Could you tell me how that occurred?

A.  I don't recall.

* * *

Q.  Was there any A&M business discussed?

A.  I don't recall.

17

Sponseller testified as follows, when he was shown an e-mail message from Chadwick at his deposition:

> Q. Okay. Now, lets go to your response at Page 409.
> A. . . . From me to Francois Chadwick, a copy to Rob McCarthy. Wednesday, March 23, 2011, 2:47. "Re: Thanks. Francois, very good meeting you as well. . . . As you move forward with your decision, don't hesitate to reach out if I can be of assistance as a sounding board, etc. I think we have a good thing going here and I think you would be a good fit. Regards."
> Q. All right. Now, what did you mean by, when you thought he would be a good fit?
> A. I meant exactly what it says, a good fit with the firm.
> Q. And why was that?
> A. Because he seemed like a good guy. It's a standard thing.
> Q. So did it really mean anything?
> A. Well, it means I think he would be a good fit. If I didn't think he would be a good fit, I probably wouldn't - - would have said that.
> Q. To him?
> A. To anybody we were recruiting. I think he would be a good fit. I don't - - wouldn't read much more into it than what it says.
> Q. You would have reported back to the recruiters that you didn't think he would be a good fit, if you thought that?
> A. Yes.

The Court finds that contradicting evidence exists about: (a) who arranged the Chadwick outing, on March 22, 2011, and the circumstances leading to that event; (b) whether McCarthy or any other employee of Alvarez & Marsal Transaction Advisory Group, LLC was asked or authorized to participate in recruiting Chadwick, including entertaining Chadwick, on March 22, 2011, as well as discussing with Chadwick his prospective employment; and (c) the nature of the relationship among Alvarez & Marsal Holdings, LLC, Alvarez & Marsal Transaction Advisory Group, LLC and Alvarez & Marsal Taxand, LLC, including any interaction among and participation by these companies in recruiting employees.

It is undisputed that employees of both Alvarez & Marsal Taxand, LLC and Alvarez & Marsal Transaction Advisory Group, LLC visited BXL with Chadwick, and that the BXL bill

was paid by Sponseller, an Alvarez & Marsal Transaction Advisory Group, LLC employee, and

that Sponseller was reimbursed for that bill by Alvarez & Marsal Transaction Advisory Group,

LLC.  The precise nature of the relationship among the three limited liability companies is

disputed.  The use of the acronym "A&M" during various depositions, as well as in the parties'

respective motions and in the course of this action, makes it difficult for the Court to discern

what limited liability company is being referenced at any given time or how many limited

liability companies are involved in any particular act or omission.  For example, Gilman's Rule

56.1 statement appears to use multiple short-form versions to identify various limited liability

companies in multiple paragraphs, as illustrated in the table below:

| Reference | Statement Number |
|---|---|
| Alvarez & Marsal Transaction Advisory Group, LLC (A&M-TAG) | 15, 52, 73 |
| A&M-TAG | 53, 57, 80, 153 |
| Alvarez & Marsal Holdings, LLC | 53, 55, 73 |
| Alvarez & Marsal | 54, 74, 135 |
| A&M | 49, 57, 58, 59, 60, 61, 62, 63, 65, 75, 83, 84, 89, 98, 105, 107, 111, 115, 121, 127, 135, 146, 147, 172, 174, 176, 184, 232, 237, 238, 242, 244, 246, 248, 249, 255, 257, 260, 262, 263, 270, 271, 273, 278, 281, 284 |
| Transaction Advisory Group | 77, 81, 82, 91 |
| A&M Tax | 96 , 118 |
| Alvarez & Marsal Taxand, LLC | 99, 118 |
| A&M Taxand | 120, 128 |

| Taxand | 129 |
| --- | --- |
| Alvarez & Marsal Taxand-International | 157 |
| A&M Tax Department | 264 |
| Transaction Advisory Group in New York | 178 |
| A&M Tax Unit | 242 |
| Alvarez and Marsal TAG | 290 |

However, the identity of the companies referenced by the plaintiff in various paragraphs of her Rule 56.1 statement remains in dispute, as it is apparent from the above table and the inconsistent and imprecise use of company names by the plaintiff.

Thus, whether McCarthy was acting within the scope of his employment, whether he was subject to the "coming and going" general rule or any exception to the general rule are genuine disputes regarding material facts that must be left for a jury to decide.  Accordingly, the Court finds that those parts of: (1) Alvarez & Marsal Transaction Advisory Group, LLC's motion for summary judgment concerning the plaintiff's claims of negligence under the doctrine of respondeat superior; and (2) the plaintiff's motion for partial summary judgment concerning her claims of negligence under the doctrine of respondeat superior against Alvarez & Marsal Transaction Advisory Group, LLC, must be denied.

### Plaintiff's Dram Shop Act Claim Against Alvarez & Marsal Transaction Advisory Group, LLC

The Dram Shop Act provides:

Any person who shall be injured in person, property, means of support, or otherwise by any intoxicated person, or by reason of the intoxication of any person, whether resulting in his death or not, shall have a right of action against any person who shall, by unlawfully selling to or unlawfully assisting in procuring liquor for such

intoxicated person, have caused or contributed to such intoxication; and in any such action such person shall have a right to recover actual and exemplary damages.

New York General Obligations Law § 11-101(1).

New York General Obligations Law § 11-101, known as the Dram Shop Act, "requires a commercial sale of alcohol," and "is properly limited to sellers of intoxicating liquors." D'Amico v. Christie, 71 N.Y.2d 76, 84, 524 N.Y.S.2d 1, 4 (1987).

In her opposition to the employer's motion, Gilman seems to have abandoned her Dram Shop Act claim against the employer. The Court finds that no evidence exists that the employer was engaged in the commercial sale of alcohol, as contemplated by the Dram Shop Act. Therefore, the employer is not subject to the Dram Shop Act. Accordingly, dismissing the plaintiff's Dram Shop Act claim, under New York General Obligations Law § 11-101, against Alvarez & Marsal Transaction Advisory Group, LLC, is warranted.

### *Plaintiff's Negligence Claims Against McCarthy*

Although in her notice of motion Gilman sought summary judgment against McCarthy, seeking an order finding him liable to her "by reason of his negligent operation of his motor vehicle while intoxicated, causing it to cross over into Plaintiff Cynthia J. Gilman's lane of travel, striking her vehicle head-on, causing her severe permanent personal injuries," she failed to make any argument in support of her request, and her memorandum of law is devoid of any reference to her negligence claims against McCarthy. Therefore, granting summary judgment on Gilman's negligence claims against McCarthy is not warranted.

### *Conclusion*

For the foregoing reasons: (1) Alvarez & Marsal Transaction Advisory Group, LLC's motion for summary judgment, Docket Entry No. 71, is (i) granted with respect to the plaintiff's

21

Dram Shop Act claim against it, and (ii) denied with respect to the plaintiff's negligence claim against it; and (2) the plaintiff's motion for summary judgment on her negligence claims against McCarthy and Alvarez & Marsal Transaction Advisory Group, LLC, Docket Entry No. 80, is denied.

Dated: New York, New York
      May 7, 2015

SO ORDERED:

_Kevin Nathaniel Fox_

KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

_cynthiagilman4.mo_

22